**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division - In Admiralty**



FILED

APR 3 2012

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

**IN THE MATTER OF THE COMPLAINT**
**OF MCALLISTER TOWNING OF**
**VIRGINIA, INC. AS OWNER OF THE**
**TUG KATIE G. MCALLISTER**

        **Limitation Plaintiff,**

v.                                              **CIVIL ACTION NO. 2:10cv595**

**UNITED STATES OF AMERICA,**

        **Claimant.**

### *MEMORANDUM OPINION AND ORDER*

This admiralty matter is before the Court for decision following a three-day bench trial

commencing on October 18, 2011. On December 2, 2010, McAllister Towing of Virginia, Inc.

("McAllister") brought this action as the owner and operator of the Tug KATIE G.

MCALLISTER ("KATIE G."), in an action for exoneration from or limitation of liability

pursuant to the Limitation of Liability Act, 46 U.S.C. §§ 30501-35012 ("Limitation Act").

Limitation Plaintiff, McAllister, moves this Court to enter an order determining that:

1) McAllister is not liable to any extent for the damage to the United States Navy's Degaussing

Range, which occurred on July 13, 2010, or alternatively 2) if McAllister is found liable for the

damage, then such damage is limited to the value of the KATIE G. as found at the time of the

casualty and that McAllister be discharged from any further liability. The parties have filed post-

trial briefs and this matter is now ripe for judicial determination. For the reasons set forth herein,

McAllister's claim for exoneration from liability is **DENIED** and McAllister's claim for

limitation of liability is **GRANTED**. The Court **GRANTS** the United States damages in the

amount of $2,520,000.00 and prejudgment interest on this amount from July 13, 2010 through the date of entry of this judgment.

## I. FACTUAL FINDINGS

### A. Stipulated Facts

The parties have stipulated to the following facts which the Court accepts and finds:

1. McAllister is a corporation existing under the laws of Virginia, with its principal place of business in Norfolk, Virginia, and was at all material times the owner *pro hac vice* and bare boat charterer of the Tug KATIE G. referred to in this Complaint.

2. The KATIE G. is a steel towing vessel, 113 feet in length, built in 1966, Official No. 505022.

3. There are no demands or unsatisfied liens against the KATIE G. which arose from the voyage at issue.

4. The KATIE G. has not been attached or arrested.

5. With the exception of the United States of America, there are no other claimants in this action.

6. The fair market value of the KATIE G. on July 13, 2010 was $2,520,000.00.

7. On July 13, 2010, the KATIE G. was towing the barge COLUMBIA ELIZABETH.

8. The maximum draft of the KATIE G. on July 13, 2010 was 16 feet.

9. On July 13, 2010, the barge COLUMBIA ELIZABETH had a draft of 12 feet fore and 15 feet aft.

10. The Degaussing Range had just undergone replacement of numerous sensors and sensor cables by Precon Marine, Inc. ("Precon"), a subcontractor of PCCI, Inc., who was

working under a government contract to repair damage to the range done by a Hapag-Lloyd freighter dragging its anchor through the range in 2007.

11. The parties and their experts agree that, as the KATIE G. and her tow moved away from the Degaussing Range after the tug's tow wire was lengthened, the tug's wire dragged an object through the array and caused the damage to the Range on July 13, 2010.

## B. Additional Factual Findings

### *McAllister's Operations*

1. McAllister owns a fleet of thirteen tugboats and employs approximately thirty captains. It operates out of its home port on the waterfront of the Elizabeth River, located at 1914 Pearl Street, Norfolk, Virginia.[1] McAllister's tugboats must navigate through the Norfolk Entrance Reach Channel, where the United States Navy's Degaussing Range is located, in order to reach the Chesapeake Bay and Atlantic Ocean.[2]

2. McAllister's tugboats have been traveling through the Entrance Reach Channel since at least 1989, when the Degaussing Range was constructed, and its captains are familiar with the Norfolk harbor, including navigational charts and ongoing construction.[3]

3. McAllister issues two written manuals that provide guidance to its captains – the "Both Book"[4] and the "Boat Book."[5] The Both Book is a quality safety management manual that provides guidance on "operations, marine, and some other processes," which apply to both its fleet and shore side operational activity.[6] McAllister maintains a copy of the Both Book onboard all its vessels and in its senior management's office.[7] The Boat Book

---

[1] Trial Tr. 410:7-412:2.
[2] McAllister Ex. 14; Trial Tr. 429:7-429:22.
[3] Trial 411:4-411:23; Trial Tr. 346:18-346:21.
[4] McAllister Ex. 122.
[5] McAllister Ex. 123.
[6] Trial Tr. 402:12-402:17.
[7] Trial Tr. 402:18-402:21.

outlines specific guidelines for fleet operations – everything from deck to engineering – and covers job descriptions, and emergency and safety procedures.[8]

4.  While the Both Book indicates that the captain is the master and in sole command of the vessel, neither manual provides specific guidance on the proper procedures for lengthening tow wire.[9]  Instead, McAllister defers to its captains to determine when and where to lengthen tow by accounting for several variables, including weather, tide conditions, and traffic, among others.[10]

5.  McAllister provides the Local Notices to Mariners ("LNMs") to its captains automatically via e-mail.[11]  LNMs are weekly publications by the Coast Guard that advise mariners of gates of navigation, hazardous navigation, and other items of marine information.[12]  They relay information such as any impediments to the navigation channel, whether there is ongoing construction work, and similar information.[13]  LNMs are available for download online.[14]

6.  McAllister holds annual "captains' meetings"[15] and conducts mandatory safety training onboard its vessels on a variety of topics.[16]  McAllister holds more frequent meetings with mariners, including, for example, when a new crew is scheduled to man a vessel, although these meetings are informal and not mandatory.[17]  McAllister's Vice-President and General Manager, Captain James E. Westall, has observed the operations of some of

---

[8] Trial Tr. 402:22-403:12.
[9] Trial Tr. 408:2-408:12.
[10] Trial Tr. 397:13-398:17.
[11] Trial Tr. 412:21-412:24.
[12] Trial Tr. 94:10-94:17.
[13] *Id.*
[14] Trial Tr. 94:18-94:19.
[15] Trial Tr. 404:20-404:22.
[16] Trial Tr. 403:25-404:16.
[17] Trial Tr. 412:3-412:14.

McAllister's vessels from a managerial perspective, although he has not done so aboard the KATIE G.[18]

### The KATIE G. MCALLISTER Crew

7.  Captain Richard Hinson, who was the master of the KATIE G. on July 13, 2010, has over thirty years of experience in the maritime industry, and specifically in the towing industry: he has served as a deck hand, mate, and captain aboard various towing vessels.[19] During his more than six years with McAllister, he has served as master of several tugboats, including the KATIE G.[20] Captain Hinson has made the trip from Norfolk, Virginia to Baltimore, Maryland with the KATIE G. for at least six years, twice per week for three years and then once per week the latter three years.[21] In all, Captain Hinson has made the Norfolk-Baltimore trip over one hundred times at least.[22]

8.  In addition to Captain Hinson, the other crew aboard the KATIE G. on July 13, 2010 included: Charles Sturgis, an engineer; Kevin Bird, a mate; Marcus Jerz, a deck hand; and Donald George, a deck hand.

9.  Charles Sturgis has served as an engineer on the Katie G. for at least two years, and he has worked on other McAllister vessels before that.[23]

10. Kevin Bird has served as mate with McAllister for five and a half years and has worked on the KATIE G. for two and a half of those years.[24] Prior to serving as a mate, Mr. Bird

---

[18] Trial Tr. 408:20-410:2.
[19] Trial Tr. 319:11-323:3.
[20] Trial Tr. 324:14-324:21.
[21] Richard Hinson Deposition at 9:23-10:9 (May 2, 2011) ("Hinson Dep.").
[22] Hinson Dep. 64:12-65:16.
[23] Trial Tr. 345:10-345:17.
[24] Trial Tr. 377:1-377:19.

served in the Navy for twenty years and worked on supply ships, landing ship docks (LSDs), and carriers.[25]

11. Donald George has been employed as a deck hand with McAllister for the entirety of his service with the company and, while his exact length of time with McAllister is not evident from the record, he has made the Norfolk-Baltimore trip on the KATIE G. between 150 and 200 times.[26]

12. The record contains no information regarding Marcus Jerz's experience in the maritime industry prior to his service on the KATIE G. on July 13, 2010, although McAllister's expert, Donald Kinsey, testified that the entire crew aboard the KATIE G. on July 13, 2010 was qualified and experienced.[27]

13. The Katie G. is outfitted with a towing, "Markey" winch spooled with approximately 2,000 feet of steel towing wire that is 2 1/4-inch in diameter.[28] It also is equipped with an Electronic Chart Display and Information System ("ECDIS") navigational computer with a video chart display.[29]

***United States Navy's Degaussing Range***

14. Since 1941, the United States Navy has maintained a Degaussing Range in the Elizabeth River off of Sewell's Point. The purpose of the Degaussing Range is to measure the magnetism of the Navy's ships as part of its mine counter-measures.[30] The Degaussing Range has been in its current location at the Norfolk Harbor Entrance Reach Channel, near Sewell's Point, since 1989.[31]

---

[25] Trial Tr. 378:15-378:24.
[26] Donald George, Jr. Deposition at 11:23-12:10 (May 3, 2011) ("George Dep.").
[27] Trial Tr. 437:3-437:5.
[28] Trial Tr. 445:4-445:24;Trial Tr. 66:22-67:6.
[29] McAllister Ex. 10; Trial Tr. 75:2-75:5; 326:25-328:23.
[30] Trial Tr. 19:19-20:3.
[31] Trial Tr. 277:17-277:25 (construction completed in 1990).

15. The Degaussing Range consists of a series of sensors located on the floor of the harbor floor.  The sensors are arranged perpendicular to the Channel and are linked by cables, which also run perpendicular to the Channel.[32]

16. As a structure in the navigable waters of the United States, the Degaussing Range is required to be authorized and permitted through the United States Army Corps of Engineers ("ACOE") pursuant to Section 10 of the River and Harbor Act of 1899, as codified at 33 U.S.C. § 403, *et seq.*[33]  The Degaussing Range also must be authorized by the Virginia Marine Resources Commission ("VMRC").

17. In 1987, the Navy received authorization in the form of a permit from the ACOE to construct the Degaussing Range at its current location.[34]  The Navy likewise received such authorization from the VMRC in 1987.[35]  Both permits incorporated technical drawings demonstrating how the Range was to be constructed.

*Prior Damage to the Degaussing Range*

18. Prior to the damage to the Degaussing Range on July 13, 2010, the Range sustained similar damage in two separate incidents in 2006 and 2007.

19. On August 8, 2006, an unknown vessel dragged an unknown object through the Range, thereby snagging cables and causing extensive damage to the Range.[36]  The Navy completed repairs resulting from the August 2006 incident later that year.[37]

20. On April 20, 2007, a container vessel, the M/V LERVERKUSEN EXPRESS, drifted through the Degaussing Range dragging its anchor and caused substantial damage to

---

[32] U.S. Ex. 26; Trial Tr. 70:3-70:7.
[33] Trial Tr. 288:1-288:4.
[34] McAllister Ex.185.
[35] McAllister Ex. 303.
[36] Trial Tr. 281:19-282:16.
[37] McAllister Ex. 329-1 at US 050381

several sensors and many cables connecting to the Data Collection Shed.[38]  The Navy

entered a contract for the repair work due to this incident, which provided that the sensors

and cables be repaired or replaced, concrete matting be placed over the cables outside of

the navigation channel, and gravel be placed over the sensors and cables within the

channel.[39]

### Current Permits for the Degaussing Range and Status of Repairs on July 13, 2010

21. The ACOE authorized the repair work resulting from the 2007 incident pursuant to its

    Nationwide Permit 3 ("NWP 3") issued by the ACOE.  The Nationwide Permit pertains

    to "the repair, rehabilitation, or replacement of any previously authorized, currently

    serviceable, structure, or fill, or of any currently serviceable structure or fill authorized"

    by the ACOE.[40]  As the Degaussing Rang is a previously authorized structure, the repair

    work following the 2007 incident fell under the NWP 3.

22. To confirm that the NWP 3 permitted the repairs contemplated by the Navy, Naval

    Facilities Engineering Command (NAVFAC) submitted detailed drawings of the

    proposed repairs to the ACOE.[41]  In a letter from the ACOE dated September 9, 2009, the

    Navy received notification that its application complied with the NWP 3 requirements

    and that the NWP 3 authorization would be valid for two years from the date of the

    September 9, 2009 letter, or later if the verification letter expired before the NWP itself

    expired.[42]

---

[38] Trial Tr. 148:1-148:10.
[39] Trial Tr. 208:18-210:1.
[40] McAllister Ex. 55 at US000385.
[41] U.S. Ex. 26; McAllister Ex. 25.
[42] McAllister Ex. 84.

23. The cables and sensors were operational on or about May 17, 2010, and the United States did not cover the cables with protective gravel between May 17, 2010 and July 13, 2010.[43]

24. On July 13, 2010, the Navy had completed the following repair work on the Degaussing Range:  the cables and sensors were repaired or replaced and were fully operational; the articulated concrete mats outside of the navigation channel had been installed partially but not completely; and the nonmagnetic protective gravel had not been installed.[44]

***Notice and Warnings of the Degaussing Range***

25. The National Oceanic and Atmospheric Administration ("NOAA") publishes three navigational charts that note the location of the Degaussing Range[45]:  Chart Number 12245,[46] entitled "Hampton Roads," as well as Chart Number 12256[47] and Chart Number 12222.[48]  On Chart Number 12245, the position of the Range is marked inside the navigational channel near Sewell's Point as a box drawn with a black dashed line labeled "Magnetic Silencing Range."[49]  The actual location of the Range is approximately one hundred feet north of this black dashed box.[50]  The Range and all of its cables are enclosed in a larger area marked by a dashed magenta line marked "Cable Area."[51]

26. A warning on Chart Number 12245, entitled "CAUTION: SUBMARINE PIPELINES AND CABLES," advises mariners of the existence of "charted submarine pipelines and

[43] Trial Tr. 303:20-305:12; Travis Steeves Deposition at 219:15-220:12 (September 7, 2011) ("Steeves Sept. Dep.").
[44] Trial Tr. 176:7-176:17; U.S. Ex. 64 at 5.
[45] Trial Tr. 73:4-74:17.
[46] U.S. Ex. 6.
[47] U.S. Ex. 7.
[48] U.S. Ex. 8.
[49] Trial Tr. 70:2-70:7; 147:8-147:25.
[50] Trial Tr. 472:13-473:14.
[51] Trial Tr. 71:5-71:16.

submarine cables and submarine pipeline and cable areas."[52]  After providing illustrations

corresponding with these areas, the Chart further states:

> Additional uncharted submarine pipelines and submarine cables may exist within
> the area of this chart. *Not all submarine pipelines and submarine cables are*
> *required to be buried, and those that were originally buried may have become*
> *exposed.* Mariners should use extreme caution when operating vessels in depths of
> water comparable to their draft in areas where pipelines and cables may exist, *and*
> *when anchoring, dragging, or trawling.*[53]

27. The Coast Guard issued at least two LNMs to warn mariners of the Navy's ongoing

construction to repair the Degaussing Range, on March 8, 2010 and on July 6, 2010.[54]

28. The LNM dated March 8, 2010, Week 10/10, stated:

> "VA – HAMPTON ROADS – NORFOLK HARBOR ENTRANCE REACH
> – SUBMARINE CABLE INSTALLATION
>
> Precon Marine, Inc. will be installing sensor cables in the vicinity of Elizabeth
> River Lighted Buoy 1ER (LLNR 9445) and Elizabeth River Channel Lighted Bell
> Buoy 3 (LLNR 9465) from 08 March until 15 April, 2010. A 120 foot barge
> pushed by the tug Dottie J will be on scene and monitoring VHF-FM channels 13
> and 16. All vessels are requested to transit at a NO WAKE speed and mariners
> are urged to use caution when transiting the area. Chart: 12245."[55]

29. The LNM dated July 6, 2010, Week 27/10, referenced the March 8, 2010 LNM, Week

10/10, stating:  "VA Elizabeth River Entrance /Sewells Pt. [:]  Submarine Cable

Install/Diving Ops 08 Mar 2010 until completed Ref.  LNM 10/10."[56]

*The KATIE G.'s Voyage Through Norfolk Harbor on July 13, 2010*

30. On July 13, 2010, the KATIE G. departed Norfolk bound for Baltimore with the

container barge, the COLUMBIA ELIZABETH, in tow.

---

[52] U.S. Ex. 6.
[53] U.S. Ex. 6; Trial Tr. 72:4-72:19 (emphasis added).
[54] The LNM from July 6, 2010 (U.S. Ex. 10) extends the LNM from March 8, 2010 (U.S. Ex. 9) warning of cable
installation in the area of the degaussing range.  Trial Tr. 96:3-97:23; Travis Steeves Deposition at 143:23-144:8
(June 9, 2011) ("Steeves June Dep.").
[55] U.S. Ex. 9; Trial Tr. 97:3-97:12.
[56] U.S. Ex. 10; Trial Tr. 96:9-96:20.

31. Inside the protected waters of the Norfolk Harbor, the KATIE G. typically tows a barge with a short tow wire of approximately 150 to 200 feet in order to maintain control of the barge.[57] However, before entering the unprotected waters of the Chesapeake Bay, the KATIE G. usually releases approximately 1,000 feet of cable between the tug and barge.[58] One thousand feet corresponds with the first mark on the tow wire, which the McAllister crew painted on the wire.[59] A greater length of tow wire between the tug and barge is necessary before entering unprotected waters in order to prevent the wire from becoming taut and potentially breaking, which would send the barge adrift.[60]

32. Typically, Captain Richard Hinson releases tow wire on the KATIE G. in the vicinity of the G-4 Anchorage.[61] The G-4 Anchorage is located north of the cable area encompassing the Degaussing Range.[62] However, on July 13, 2010, Captain Hinson began releasing the tow wire after passing the G-3 buoy,[63] which is located south of the Degaussing Range.

33. Captain Hinson decided to lengthen the wire sooner than he usually does due to weather and traffic conditions in the harbor on July 13, 2010. Specifically, the wind was out of the east and the south, which causes swelling in the lower end of the Chesapeake Bay.[64]

34. The traffic conditions included another vessel, the USNS ARTIC, which was outbound and following the KATIE G. The USNS ARTIC approached the KATIE G. from behind and the Harbor Pilot aboard the USNS ARTIC, William Diggs, requested permission to overtake and pass the KATIE G. on the tug's port (left) side, to which the KATIE G.

---

[57] Trial Tr. 332:5-332:15.
[58] Trial Tr. 337:7-337:24.
[59] Trail Tr. 343:2-343:17.
[60] Trial Tr. 337:12-337:24.
[61] Trial Tr. 336:15-336:23.
[62] Trial Tr. 69:7-69:9.
[63] Trial Tr. 340:342:4.
[64] Trial Tr. 342:14-342:24.

consented.[65]  The USNS ARTIC then proceeded to overtake the KATIE G. accordingly.[66] The US ACE HARRELL, an Army Corps of Engineers' vessel, also was in the vicinity of the KATIE G.[67]

35. On July 13, 2010, the KATIE G. "dumped" or quickly released at least 1,300 feet of tow wire as the tug approached the Degaussing Range.  This length corresponds approximately with the second mark on the tow wire.[68]

36. A catenary is the vertical deflection of a tow wire from a horizontal line or a "sag" in the midpoint of the cable between the tug and barge.[69]  The catenary serves as a "shock absorber" between the tug and barge which allows both vessels to respond independently to the surges and swells of the sea.[70]  As more wire is released between two vessels and the distance between them decreases, the catenary will sag deeper and deeper below the water surface.[71]

37. On July 13, 2010, the depth of the catenary in the KATIE G.'s tow wire was at least the depth of the navigation channel, which is between -51 and -54 feet Mean Low Water.

38. As the KATIE G. and the COLUMBIA ELIZABETH passed over the Degaussing Range, the KATIE G.'s tow wire snagged an unknown object located on the seabed and dragged it through the Range's cables, thereby causing substantial damage to many cables and sensors.

---

[65] Trial Tr. 52:10-56:12.
[66] *Id.*
[67] Trial Tr. 330:16-330:21.
[68] Trial Tr. 342:14-343:13.
[69] Trial Tr. 76:1-76:15.
[70] Trial Tr. 76:16-77:5.
[71] Trial Tr. 76:9-76:15.

39. Soon after the KATIE G. passed over the Range, one of the deck hands, Donald George, nervously commented to another deck hand, Marcus Jerz, that Mr. George thought they "might have hit something or dragged something, the wire."[72]

40. The unknown object that the KATIE G. dragged through the Degaussing Range caused a drag mark that was approximately seven hundred feet long, five feet wide and six inches deep.[73]

41. As the KATIE G. and COLUMBIA ELIZABETH passed over the Degaussing Range, the Navy's Range Operator Mitchell Johnson was on watch.  After the KATIE G. passed over the Range, but before the COLUMBIA ELIZABETH passed over the Range, Mr. Johnson observed that twenty-one of the Range's twenty-six sensors suddenly stopped registering background magnetism, as they normally function.[74]  Mr. Johnson confirmed with a Range Operator at another computer station, Timothy Murphy, that neither station was receiving a signal from twenty-one sensors.[75]  Mr. Murphy hailed the KATIE G. several times on the VHF radio, but Mr. Murphy received no response.

42. Mr. Murphy then hailed the USNS ARTIC by VHF radio and asked Pilot William Diggs to identify the vessel in the vicinity of the Degaussing Range, which Pilot Diggs verified was the KATIE G.

43. Donald George, a deck hand, was on the bridge of the KATIE G. at the very end of the towing evolution.  Mr. George heard both the Navy hail the KATIE G. and the Navy call a third party to identify the tug, which Mr. George found to be odd.[76]  Mr. George did not

---

[72] Trial Tr. 140:13-143:4.
[73] Trial Tr. 552:7-552:19.
[74] Trial Tr. 30:25-31:15.
[75] Trial Tr. 31:11-31:15; Trial Tr. 48:20-49:20.
[76] George Dep. 18:13-20:8.

13

hear the KATIE G. answer the VHF radio calls from the Navy during the time he was speaking with Captain Richard Hinson on the bridge.[77]

44. Shortly after the KATIE G. dragged an object through the Degaussing Range, the Navy hired divers to inspect the damage to the Range.[78]  The divers confirmed that the majority of the cables had been displaced in a northerly direction and then severed, and that a number of sensors had been damaged.[79]  A side-scan sonar also confirmed that an object was dragged along the seabed and cut a trench through the Degaussing Range's cables.[80]

***Repairs to the Degaussing Range Following July 13, 2010 Incident and Damages***

45. Following the July 13, 2010 incident, the Navy decided to both repair the Degaussing Range and provide additional protection in order to prevent future damage to the structure.  As a result, the Navy entered into two separate contracts, the "repair" contract and the "hardening" contract.

46. The "repair" contract is for the construction required to return the Degaussing Range's sensors and cables to their condition prior to July 13, 2010.  The "repair" contract includes the following costs:  assessment of July 13, 2010 damage; planning; contract acquisition; and repairs.[81]

47. The "hardening" contract is for construction to add more concrete matting, more protective gravel, and conduits through which the Degaussing Range's cables will run.[82]  The "hardening" contract is currently being performed, and its costs are not part of the United States' claim in this case.

---

[77] George Dep. 17:3-20:11.
[78] Trial Tr. 183:15-183:22.
[79] Trial Tr. 183:23-184:7.
[80] U.S. Exs. 48a-48c; Trial Tr. 178:3-183:13; Trial Tr. 537:8-538:19.
[81] U.S. Ex. 17; Trial Tr. 208:18-201:1.
[82] Trail Tr. 215:4-215:13.

48. The United States has calculated its damages to repair the Degaussing Range to its condition before the July 13, 2010 incident to be $3,506,506.80.

49. The United States' proven damages amount to $3,199,938.00.

## II. CONCLUSIONS OF LAW

1. The Court has subject matter jurisdiction over this admiralty action pursuant to 28 U.S.C. § 1333.  Venue is vested in this Court pursuant to 28 U.S.C. § 1391(b) and Supplemental Rule F(9) because the KATIE G. MCALLISTER and the Degaussing Range are located in this district and the allision giving rise to this action occurred in this district. Furthermore, McAllister has invoked this Court's admiralty jurisdiction and maritime jurisdiction pursuant to the Limitation of Liability Act, 46 U.S.C. §§ 30501-35012 ("Limitation Act").

2. Pursuant to the Limitation Act, an owner of a vessel that was involved in an accident may bring an action in federal court to determine whether the vessel is liable for the loss and whether the vessel owner's liability should be limited.  46 U.S.C. §§ 30501-35012.

3. A vessel owner may limit his liability to the value of his interest in the vessel plus pending freight upon a showing that the cause of the accident was not within his privity or knowledge.  46 U.S.C. § 30505.  Thus, in deciding a limitation action, the Court must use a two-step analysis to determine (1) whether the accident was caused by the negligence of the vessel and (2) whether the vessel owner had knowledge of the events which caused the accident.  *Empresas Lineas Maritimas Argentinas S.A. v. United States*, 730 F.2d 153, 155 (4th Cir. 1983).

4. Privity and knowledge, as used in the statute, mean that a vessel owner knew or should have known that a certain condition existed.  *Hellenic Lines, Ltd. v. Prudential Lines,*

*Inc.*, 813 F.2d 634, 638 (4th Cir. 1987). In the case of a corporation, the privity or knowledge requirement applies to "an executive officer, manager, or superintendent, whose scope of authority includes supervision over the phase of the business out of which the injury occurred." *Empresas Lineas Maritimas Argentinas*, 730 F.2d at 155.

5. A vessel owner seeking to limit his liability bears the burden of proving that he did not have privity or knowledge of the condition or negligence that caused the accident. *Hellenic Lines, Ltd.*, 813 F.2d at 638.

6. Common law negligence principles apply in an admiralty suit alleging maritime tort. *In Re Christiansen Marine, Inc.*, No. 2:95cv896, 1996 WL 616188, at *8 (E.D. Va. Apr. 11, 1996) (citing *Cargill, Inc. v. C & P Towing Co., Inc.*, Civ. A. No. 89-378-N, 1990 WL 270199, *1 (E.D. Va. Aug. 16, 1990)), *aff'd*, 943 F.2d 48, 1992 A.M.C. 392 (4th Cir. 1991) (unpublished)). Therefore, to prove negligence in a maritime setting, a litigant must establish that its adversary failed to exercise reasonable care under the circumstances. *In Re Christiansen Marine, Inc.*, 1996 WL 616188, at *8; *Coumou v. United States*, 107 F.3d 290, 295-96 (5th Cir. 1997), *withdrawn and superseded in part on reh'g by Coumou v. United States*, 114 F.3d 64 (5th Cir. 1997) ("The general maritime law of negligence recognizes a duty of reasonable care under existing circumstances.").

7. A duty of care exists when injury is foreseeable. Thomas J. Schoenbaum, Admiralty & Maritime Law § 5-2, at 254 (5th ed. 2011) (citing *Daigle v. Point Landing, Inc.*, 616 F.2d 825 (5th Cir. 1980)).

8. The mere occurrence of an allision[83] does not automatically impart liability to the vessel or her owner. Liability requires a finding of "fault" that caused or contributed to the

---

[83] "An allision is a collision between a moving vessel and a stationary object." *Evergreen Int'l., S.A. v. Norfolk Dredging Co.*, 531 F.3d 302, 304 n.1 (4th Cir. 2008) (citations omitted).

16

damage incurred. *In re American Milling Co.*, 270 F. Supp. 2d 1068, 1087 (E.D. Mo.
2003), *rev'd on other grounds by In re American Milling Co., Ltd.*, 409 F.3d 1005 (8th
Cir. 2005).

9. Under admiralty law, the *Oregon* Rule creates a rebuttable presumption of fault against a
moving vessel, which under its own power, allides with a stationary object. *The Oregon*,
158 U.S. 186,192-93 (1895); *Yarmouth Sea Prods. Ltd. v. Scully*, 131 F.3d 389, 393 (4th
Cir. 1997). This presumption is enough to make a *prima facie* case of negligence against
the moving vessel. *Brown and Root Marine Operators, Inc. v. Zapata Off-Shore Co.*,
377 F.2d 724, 726 (5th Cir. 1967).

10. There is a narrow exception to the *Oregon* presumption if a moving vessel strikes a
stationary object that is submerged or hidden, but this exception is limited: "While [the
*Oregon*] presumption generally does not apply to allisions with sunken or hidden objects,
'knowledge of an otherwise nonvisible object warrants imposition of presumed
negligence against those operating the vessel who possessed this knowledge.' " *Pennzoil
Producing Co. v. Offshore Exp., Inc.*, 943 F.2d 1465, 1471 (5th Cir. 1991) (internal
citations omitted).

11. Once fault is presumed, the defendant may come forward with evidence to rebut the
presumption, *The Oregon*, 158 U.S. at 192-93, by showing that: (1) the moving vessel
was without fault; (2) the allision was actually the fault of the stationary object; or (3) the
allision was the result of an inevitable accident. *CSX Transp., Inc. v. M/V Hellespont
Mariner*, No. 90-1553, 1991 WL 173045, at *2 (4th Cir. Sept. 10, 1991) (unpublished);
*Dann Marine Towing, L.C. v. McLean Contracting Co.*, 4:09cv30, 2010 WL 1486008, at
*5 (E.D. Va. Jan. 21, 2010). "The burden is a heavy one and must be proved by a

preponderance of the evidence.  Moreover, the presumption must be disproved.  It will not suffice for the party against whom it is operating to merely com[e] forward with countervailing evidence." *CSX Transp., Inc.*, 943 F.2d at 48 (internal citations omitted).

12. The doctrine of *res ipsa loquitur* is a legal presumption applicable to admiralty law.  *Res ipsa loquitur* creates a rebuttable presumption of negligence in certain cases where: "(1) the event is of a type which ordinarily does not happen in the absence of someone's negligence; (2) the instrumentality causing the injury was, at the time of the accident, within the exclusive control of the defendant; (3) the accident was not due to any voluntary action or contribution on the part of the plaintiff." *Estate of Larkins by Larkins v. Farrell Lines, Inc.*, 806 F.2d 510, 513 (4th Cir. 1986).

13. The *Pennsylvania* Rule is a legal presumption applicable to maritime casualties.  The Rule holds that if a vessel or structure involved in a collision or allision was in actual violation of a statutory or regulatory rule that is intended to prevent such incidents, the burden shifts to the non-compliant vessel or structure to show that its violation was not a cause of the incident.  *The Pennsylvania*, 86 U.S. 125, 136 (1873); *Evergreen Int'l, S.A. v. Norfolk Dredging Co.*, 531 F.2d 302, 310 (4th Cir. 2008).  For the *Pennsylvania* Rule to be applied, three factors must be present:  "(1) proof by a preponderance of the evidence of violation of a statute or regulation that imposes a mandatory duty; (2) the statute or regulation must involve marine safety or navigation; and (3) the injury suffered must be of a nature that the statute or regulation was intended to prevent." *Union Pacific R. Co. v. Kirby Inland Marine, Inc. of Miss.*, 296 F.3d 671, 674 (8th Cir. 2002) (citing *Folkstone Mar. Ltd. v. CSX Corp.*, 64 F.3d 1037, 1047 (7th Cir. 1995)).

14. The KATIE G. crew was negligent in quickly releasing at least 1,300 feet of tow wire as the tug approached the Degaussing Range.

15. The KATIE G. crew's negligent lengthening of the tow wire was the sole proximate cause of the damage to the Degaussing Range on July 13, 2010.

16. Under maritime tort law, liability for collisions as well as allisions is apportioned based upon comparative fault, where the Court may find that both parties contributed to the accident. The Supreme Court has held: "When two or more parties have contributed by their fault to cause property damage in a maritime collision or stranding, liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault, and that liability for such damages is to be allocated equally only when the parties are equally at fault or when it is not possible fairly to measure the comparative degree of their fault." *United States v. Reliable Transfer Co.*, 421 U.S. 397, 411 (1975); *see also State of Md. Dep't of Natural Res. v. Kellum*, 51 F.3d 1220, 1223-24 (4th Cir. 1995).

17. Under the comparative fault analysis between a vessel and a stationary object, "a vessel may minimize its liability by providing evidence that the stationary object contributed to the injury it incurred, [sic] however, it will be absolved of liability only if the stationary object is deemed the sole proximate cause of the injury." *City of Chicago v. M/V Morgan*, 375 F.3d 563, 573 (7th Cir. 2004) (citing *Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 802 (5th Cir. 1977)).

18. Where a vessel causes physical damage to shore structures and to fixed objects, the owner of the damaged structure is entitled to an award for damages that restores the structure to its pre-casualty condition if the damaged structure is not a total loss. Thomas

J. Schoenbaum, Admiralty & Maritime Law § 14-6, at 143-45 (5th ed. 2011); *Hewlett v.*

*Barge Bertie*, 418 F.2d 654 (4th Cir. 1969) (a vessel owner is entitled to an award for

damages that restores the injured vessel to its pre-casualty condition).

19. Where the damage to the structure is repairable, the offending vessel is liable for

reasonable repairs. Schoenbaum, Admiralty & Maritime Law § 14-6, at 145-46 (citing

*Elgin, Joliet, & Eastern Ry. v. Am. Commercial Line, Inc.*, 317 F. Supp. 175 (N.D. Ill

1970)). If the owner of the damaged structure carries out the repairs, reasonable

overhead charges are proper. Schoenbaum, Admiralty & Maritime Law § 14-6, at 146

(citing *United States v. Peavey Barge Line*, 748 F.2d 395 (7th Cir. 1984)).

20. The United States is entitled to damages in the amount of $2,520,000.00, which

represents the fair market value of the KATIE G. MCALLISTER on July 13, 2010.

21. Generally, prejudgment interest should be awarded in a maritime case unless there are

exceptional circumstances, such as undue delay by the prevailing party in bringing suit.

*City of Milwaukee v. Cement Div., Nat'l Gypsum Co.*, 515 U.S. 189, 195 (1995); *Nat'l*

*Shipping Co. of Saudi Arabia v. United States*, 95 F. Supp. 2d 482, 495 (E.D. Va. 2000)

(citations omitted).

22. In admiralty cases, prejudgment interest is an element of damages, "part of full and fair

compensation to the injured party." *Ameejee Valleejee & Sons v. M/V Victoria U.*, 661

F.2d 310, 313 (4th Cir. 1981).

23. The award of prejudgment interest rests within the sound discretion of the district court.

*Ameejee Valleejee & Sons*, 661 F.2d at 313. "When awarding prejudgment interest, the

Court has discretion with regard to the interest rate and the date when interest begins to

accrue." *Norfolk S. Ry. Co. v. Moran Towing Corp.*, 718 F. Supp. 2d 658, 663 (E.D. Va.

2010). *See also Ameejee Valleejee & Sons*, 661 F.2d at 313 (noting that district courts "have been urged to follow the interest rate prevailing commercially"); *Indep. Bulk Transp., Inc. v. Vessel Morania Abaco*, 676 F.2d 23, 25 (2d Cir. 1982) ("Prejudgment interest has often been awarded from the time of injury.").

24. Courts have granted prejudgment interest from the date of the allision to the date of judgment at the average prime rate, compounded annually. *See, e.g., Norfolk & Portsmouth Belt Line R.R. Co. v. M/V MARLIN*, 2:08cv134, 2009 WL 3363983, at *14-*15 (E.D. Va. Oct. 9, 2009) (granting prejudgment interest from the date of an allision and at the average prime rate, compounded annually); *Norfolk S. Ry. Co.*, 718 F. Supp. 2d at 663, 663 (E.D. Va. 2010) (granting plaintiff prejudgment interest at "the average prime interest rate and from the date of the allision to the date of this judgment").

25. The United States is entitled to prejudgment interest on its damages award commencing on July 13, 2010 through the date of judgment.

## III. DISCUSSION

### A. McAllister's Claim for Exoneration from Liability

In deciding a limitation action, the Court must employ a two-step analysis to determine (1) whether the accident was caused by the negligence of the vessel and (2) whether the vessel owner had knowledge of the events which caused the accident. *Empresas Lineas Maritimas Argentinas S.A. v. United States*, 730 F.2d 153, 155 (4th Cir. 1983).

The parties and their experts agree that the KATIE G.'s tow wire dragged an object through the Degaussing Range and that this act caused extensive damage to the Range. The parties disagree, however, on whether the KATIE G. was negligent in causing the damage. As one court has noted, "the mere occurrence of an allision does not automatically impart liability to

the vessel or her owner.  Liability requires a finding of 'fault' that caused or contributed to the damage incurred." *In re American Milling Co.*, 270 F. Supp. 2d 1068, 1087 (E.D. Mo. 2003), *rev'd on other grounds by In re American Milling Co., Ltd.*, 409 F.3d 1005 (8th Cir. 2005). Accordingly, the Court first must decide whether the KATIE G.'s negligence caused the damage to the Degaussing Range.

Common law negligence principles apply in an admiralty suit alleging maritime tort. *Cargill, Inc. v. C & P Towing Co., Inc.*, Civ. A. No. 89–378–N, 1990 WL 270199, *1 (E.D. Va. Aug. 16, 1990), *aff'd*, 943 F.2d 48 (4th Cir. 1991) (unpublished)).  Therefore, in order to prove negligence in a maritime setting, "a litigant must establish that its adversary failed to exercise reasonable care under the circumstances." *In re Christiansen Marine, Inc.*, No. 2:95cv896, 1996 WL 616188, at *8 (E.D. Va. Apr. 11, 1996); *Coumou v. United States*, 107 F.3d 290, 295-96 (5th Cir. 1997), *withdrawn and superseded in part on reh'g by Coumou v. United States*, 114 F.3d 64 (5th Cir. 1997) ("The general maritime law of negligence recognizes a duty of reasonable care under existing circumstances.").  Further, a duty of care exists when injury is foreseeable. Thomas J. Schoenbaum, Admiralty & Maritime Law § 5-2, at 254 (5th ed. 2011) (citing *Daigle v. Point Landing, Inc.*, 616 F.2d 825 (5th Cir. 1980)).

Further, liability for allisions is governed by a collection of legal presumptions and shifting burdens of proof. *In re American Milling Co.*, 270 F. Supp. 2d at 1087.  One such legal presumption is the *Oregon* Rule, which creates a rebuttable presumption of fault against a moving vessel, which under its own power, allides with a stationary object. *The Oregon*, 158 U.S. at 192-93 (1895); *Yarmouth Sea Prods. Ltd. v. Scully*, 131 F.3d 389, 393 (4th Cir. 1997). As the Fourth Circuit has stated:

> The presumption derives from the common-sense observation that moving vessels do not usually collide with stationary objects unless the vessel is mishandled in some way.  It

stems also from the observation that "any evidence of actual negligence, or the lack of it, is likely to be known only to the persons on board, who are in the best position to either keep damaging evidence hidden, or bring favorable evidence forward."

*CSX Transp., Inc. v. M/V Hellespont Mariner*, 943 F.2d 48, 48 (4th Cir. 1991) (unpublished) (internal citations omitted).

However, "application of the Oregon presumption does not supplant the general negligence determination which requires a plaintiff to prove the elements of duty, breach, causation and injury by a preponderance of the evidence; rather, it merely satisfies the plaintiff's *prima facie* case of negligence." *City of Chicago v. M/V Morgan*, 375 F.3d 563, 572-73 (7th Cir. 2004); *see also Brown and Root Marine Operators, Inc. v. Zapata Off–Shore Co.*, 377 F.2d 724, 726 (5th Cir. 1967). Once fault is presumed, the defendant may come forward with evidence to rebut the presumption, *The Oregon*, 158 U.S. at 192-93, by showing that: (1) the moving vessel was without fault; (2) the allision was actually the fault of the stationary object; or (3) the allision was the result of an inevitable accident. *CSX Transp., Inc. v. M/V Hellespont Mariner*, 943 F.2d 48, 48 (4th Cir. 1991) (unpublished); *Dann Marine Towing, L.C. v. McLean Contracting Co.*, 4:09cv30, 2010 WL 1486008, at *5 (E.D. Va. Jan. 21, 2010). "The burden is a heavy one and must be proved by a preponderance of the evidence. Moreover, the presumption must be disproved. It will not suffice for the party against whom it is operating to merely com[e] forward with countervailing evidence." *CSX Transp., Inc.*, 943 F.2d at 48 (internal citations omitted). There is a narrow exception to the Oregon presumption if a moving vessel strikes a stationary object that is submerged or hidden; however, this exception is limited: "While [the Oregon] presumption generally does not apply to allisions with sunken or hidden objects, 'knowledge of an otherwise nonvisible object warrants imposition of presumed negligence against those

23

operating the vessel who possessed this knowledge.' " *Pennzoil Producing Co. v. Offshore Exp., Inc.*, 943 F.2d 1465, 1471 (5th Cir. 1991) (internal citations omitted).

Rebutting the *Oregon* presumption does not necessarily exonerate the vessel from all liability. Under the principles of pure comparative fault, the Court may find that both parties contributed to the accident. On the issue of comparative fault, the Supreme Court has held:

> When two or more parties have contributed by their fault to cause property damage in a maritime collision or stranding, liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault, and that liability for such damages is to be allocated equally only when the parties are equally at fault or when it is not possible fairly to measure the comparative degree of their fault.

*United States v. Reliable Transfer Co.*, 421 U.S. 397, 411 (1975); *see also State of Md. Dep't of Natural Res. v. Kellum*, 51 F.3d 1220, 1223-24 (4th Cir. 1995). Accordingly, under the comparative fault analysis between a vessel and a stationary object, "a vessel may minimize its liability by providing evidence that the stationary object contributed to the injury it incurred, [sic] however, it will be absolved of liability only if the stationary object is deemed the sole proximate cause of the injury." *City of Chicago v. M/V Morgan*, 375 F.3d 563, 573 (7th Cir. 2004) (citing *Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 802 (5th Cir. 1977)).

In light of the foregoing, the KATIE G. is presumed to be negligent as a moving vessel which allided with the Degaussing Range,[84] a stationary object of which the KATIE G. crew was aware. The Degaussing Range has existed in the Norfolk Harbor Reach Channel Entrance since 1990, and it is reflected on several NOAA charts. The KATIE G. navigated through the Degaussing Range at least one hundred times. Moreover, the KATIE G. crew knew (or should have known) about the ongoing construction to the Range, which put the crew on notice to exercise extreme caution when traversing the Range on July 13, 2010.

---

[84] The Court concludes that the fact that the KATIE G.'s tow wire struck an inanimate object on the seabed, which the tug then dragged through the Degaussing Range, does not undercut the basic principle of the Oregon Rule.

24

Further, McAllister has failed to rebut the presumption of fault. Of the three main ways to rebut the presumption, McAllister appears to rely on two primarily: 1) the KATIE G. crew was without fault and 2) the allision was the United States' fault due to its lack of compliance with its permits and the Degaussing Range's poor design. As discussed *infra*, the Court rejects both of these arguments.

However, even in the absence of the *Oregon* presumption of fault, the Court finds that the KATIE G. was negligent when it caused the damage to the Degaussing Range. The captain of the KATIE G., Captain Richard Hinson, and his crew had a duty to perform their responsibilities with reasonable care under the circumstances. *In Re Christiansen Marine, Inc.*, 1996 WL 616188, at *8; *Coumou*, 107 F.3d at 295-96. By failing to control the catenary in the KATIE G.'s tow wire as the tug approached the Degaussing Range, the KATIE G. crew breached this duty. Further, the parties have stipulated that the KATIE G.'s tow wire dragged an object through the Degaussing Range; therefore, the KATIE G.'s tow wire was a cause of the damage to the Degaussing Range. However, McAllister contends that the KATIE G. is not the legal cause of the damage to the Degaussing Range, given McAllister's allegations that the United States violated its permits and was comparatively negligent in its maintenance of the array. The Court rejects these arguments and finds that the KATIE G.'s negligent tow operation was the sole proximate cause of the incident. Lastly, the Degaussing Range was damaged extensively as a result of the KATIE G. crew's failure to control the catenary in the tug's tow wire as the tug approached the Range; therefore, the element of injury is not at issue in this case.

As discussed further *infra*, it is foreseeable that lengthening an excess of steel tow wire in a cable area could result in damage to cables if that wire drops to the seabed, either by the wire damaging the cables directly or by the wire dragging debris through the cable area. In the case

of the KATIE G., the crew was aware of the location of the Degaussing Range and ongoing construction to the array and, thus, the need to exercise extreme caution in the cable area. Therefore, the KATIE G. had a duty to exercise reasonable care as the tug and barge approached the Degaussing Range on July 13, 2010. *In Re Christiansen Marine, Inc.*, 1996 WL 616188, at *8 (standard of proof in a maritime negligence action is failure to exercise reasonable care under the circumstances); Schoenbaum, Admiralty & Maritime Law § 5-2, at 254 ("A duty of care exists when injury is foreseeable.").

Moreover, the KATIE G. crew breached its duty of care. The two central issues in this case that are determinative of the KATIE G.'s breach of duty are: 1) the length of the wire that the KATIE G. released on July 13, 2010, and consequently, 2) the depth of the catenary, or the horizontal "sag," in the tow wire as the KATIE G. approached the Degaussing Range. The Court finds that the greater weight of the evidence shows that the KATIE G. crew lengthened the tug's tow wire between 1,300 and 1,500 feet on July 13, 2010 and that as a result, the catenary in the wire was at least as deep as the navigation channel, or -51 to -54 feet. Accordingly, the Court finds that Captain Richard Hinson and his crew failed to exercise reasonable care when streaming the KATIE G.'s tow wire on July 13, 2010 as the tug approached the Degaussing Range.

The testimony of McAllister's witnesses varied regarding the length of the KATIE G.'s tow wire and the resulting depth of the catenary in the wire on the day of the incident. The master aboard the KATIE G., Captain Hinson, testified that, before entering the Chesapeake Bay, he typically releases approximately 1,000 feet of tow wire, which corresponds with the first painted mark on the wire. Captain Hinson further testified that, on July 13, 2010, he released more than the usual amount of tow wire because the traffic and weather conditions required a

longer wire.  As a result, Captain Hinson directed the engineer, Charles Sturgis, to lengthen the

the tow wire to the second painted mark, or approximately 1,300 feet.  Kevin Bird, a mate aboard

the KATE G. partially corroborated Captain Hinson's testimony regarding the length of the tow

wire by testifying that the difference between the first and second marks on the tow wire is

approximately 300 feet.[85]  Captain Hinson later testified that before 1,300 feet of tow wire

becomes taut, the catenary could be as much as 75 to 100 feet below the water level.[86]

Additionally, one of McAllister's experts, Mr. Donald Kinsey, Jr., estimated that the KATIE G.

was between 1,200 and 1,300 feet apart from the COLUMBIA ELIZABETH and that the wire

had a catenary of approximately 24 feet.[87]

On the other hand, the United States' expert, Captain Richard DiNapoli, estimated that

the KATIE G. lengthened between 1,300 and 1,500 feet of tow wire and that the catenary was at

least the depth of the channel, i.e., between -51 and -54 feet.  In support of his conclusion that the

tow wire dropped to the seabed, Captain DiNapoli referred to the Navy's video of the

Degaussing Range on July 13, 2010,[88] which shows first the KATE G. and then the

COLUMBIA ELIZABETH passing over the Range.  Captain DiNapoli described the front of the

barge accordingly:

> The bridle and the towline are hanging straight down almost vertically, which shows that
> there is little or no forward pull on it.  That suggests that that [sic] cable has been allowed
> to fall way down to almost the seabed, either at or on the seabed . . . .
>
> You can see fairly clearly that the bridge is – it's actually a leaning a bit aft.  It's in a
> worse condition than hanging straight up and down.  It's leaning aft, which means it's

---

[85] Trial Tr. 387:14-388:4.
[86] Trial Tr. 375:7-375:11:
     THE COURT: So for a piece of cable that's 1,000 to 1300 [sic] feet long, you could have a catenary that
could drop as much as 75 to a hundred feet in the middle of it, couldn't you?
     [HINSON]: You could have.
[87] Trial Tr. 452:8-454:5
[88] U.S. Ex. 2.

starting to run over itself and starting to run over its own cable.  Again, that suggests that it's mostly likely on the bottom.[89]

As a result, Captain DiNapoli's opinion was that the KATIE G.'s tow wire snagged an object on the seabed which the wire then dragged through the Degaussing Range, thereby causing the extensive damage.

The testimony of McAllister's expert, Donald Kinsey, Jr., supports Captain DiNapoli's observation and conclusion: "You never want to see the bridle legs pressed up against the rig or the bow of the barge.  If they are swept back and pressed up against that rig, it means, essentially, that your barge is overrunning your tow wire."[90]  Kevin Bird, a mate aboard the KATIE G. on July 13, 2010, also testified that the consequence of releasing too much wire is that the wire can run under the barge and the barge will turn:

> If we start paying out[91] too much wire, then the wire can get to the bottom and it can drag, and it can catch on stuff.  And if it does, it will catch and the bridles will be sucked back up underneath the barge and it will cause the barge to turn.[92]

Notably, the scenario Mr. Bird described is exactly what happened in this case – the tow wire snagged an object and the COLUMBIA ELIZABETH turned ninety-degrees to port while the KATIE G. turned almost ninety degrees to starboard.[93]

In opposition to this testimony showing that the KATIE G. crew released out at least 1,300 feet of wire as the tug approached the Degaussing Range is the testimony of McAllister's other expert, Dr. William Ryan, who estimated that the length of wire between the tug and barge was 1,000 feet.[94]  In reliance on this approximate length, Dr. Ryan further estimated that the

---

[89] Trial Tr. 80:10-86:1.
[90] Trial Tr. 430:8-430:15.
[91] The industry terms for releasing tow wire include "paying out" the wire or  "streaming hawser," among others.
[92] Trial Tr. 386:2-386:11.
[93] Trial Tr. 538:20-540:16.
[94] Trial Tr. 501:22-502:5.

depth of the catenary in the wire was no more than 5 to 10 feet deep.[95]  Based on these opinions,

Dr. Ryan further opined that the cause of the drag mark was a mooring line at or near the surface

that was connected to an anchor, which the KATIE G.'s tow wire then dragged through the

array.[96]  However, Dr. Ryan's testimony regarding the length of the tow wire and the depth of

the catenary lacks credibility.  Dr. Ryan estimated the distance between the KATIE G. and the

COLUMBIA ELIZABETH to be 1,000 feet and the length of the tow wire also to be 1,000 feet.

As Captain DiNapoli testified, however, if the length of wire between the tug and barge was only

1,000 feet, then the tow wire would have been taut, since 1,000 feet was also the approximate

distance between the two vessels.[97]  To the contrary, the evidence shows that a significant

amount of tow wire was below the water surface.  Further, there is no evidence of a surface ball

connected to a mooring line in the vicinity of the Degaussing Range.  The Court finds Dr. Ryan's

testimony incredible and not supported by the greater weight of the evidence.  The video of the

Range and the other evidence in the record – including the fact that the tug slowed to almost zero

knots[98] and dragged a submerged object through the array – indicate that the length of tow wire

between the KATIE G. and COLUMBIA ELIZABETH was at least 1,300 feet.  Additionally, the

Court finds Mr. Kinsey's testimony that the catenary was approximately 24 feet deep to lack

credibility.

   The Court further finds that it was negligent for the KATIE G. to release 1,300 to 1,500

feet of tow wire as the tug approached the Degaussing Range given the presence of the cable

area and the ongoing construction to the Degaussing Range.  While the parties' experts disagree

on whether the KATIE G.'s crew was negligent in streaming the tow wire over a cable area, the

---

[95] Trial Tr. 505:17-507:16.
[96] Trial Tr. 510:17-510:20.
[97] Trial Tr. 103:13-103:22.
[98] McAllister Ex. 10 (Katie G.'s ECDIS data).

Court finds the testimony of the United States' witness more credible and supported even by the KATIE G.'s crew. Captain DiNapoli testified that, while Captain Hinson should not be expected to know the exact configuration of the Degaussing Range on the seabed, "he just knows there is something and it's in a cable area, so it might be a good time to exercise some caution."[99] Captain DiNapoli further opined: "I personally would not have chosen to stream the . . . tow wire over a cable area. This was a departure from their routine practice, as [Captain Hinson] testified."[100] Captain DiNapoli refers to Captain Hinson's testimony that his routine practice is to begin lengthening tow wire in the vicinity of the G-4 anchorage, which is north of the Degaussing Range, but that he did not do so on July 13, 2010. Further, McAllister's expert, Mr. Kinsey, testified that the KATIE G. crew had lengthened the tow wire in the same area as it did on July 13, 2010 – in the vicinity of the G-3 buoy – only *occasionally* in the past.[101] Mr. Kinsey also testified that he saw no evidence that the crew aboard the KATIE G. was negligent on July 13, 2010.[102] As noted earlier, however, the Court gives greater weight to Captain DiNapoli's opinion. Moreover, while Captain Hinson testified that he was aware of the winds and surge that day and of the "tight" channel, which required extra caution on the part of his crew,[103] the Court finds that the crew failed to heed these hazards.

The Court's finding that the KATIE G. crew was negligent in releasing at least 1,300 feet of wire is supported further by the testimony of two crewmembers aboard the KATIE G. – Marcus Jerz and Kate Bird – that the crew "dumped" tow wire into the water in "free wheel mode." Marcus Jerz testified in his deposition that the KATIE G. "dump[ed] more wire" in the

---

[99] Trial Tr. 102:22-103:2.
[100] Trial Tr. 69:4-69:7.
[101] Trial Tr. 436:17-437:2.
[102] Trial Tr. 437:6-437:12.
[103] Trial Tr. 340:14-343:13.

process of streaming the tow.[104] The United States' expert, Captain DiNapoli, explained what it

means to "dump" tow wire:

> [W]ith this slightly older configuration winch, as I said, you have to set the brake so that
> there is a light drag on the winch drum as the wire is coming out. When you are not in a
> cable area, the lesser of the two sins is to set it too loosely. You would rather that the wire
> fall to the bottom where you can recover it than have that brake set too tightly where that
> wire can come up and snatch apart. Then you have all kinds of problems.
>
> So the setting on the brake tends to be a little bit too light. What happens with that
> sometimes is . . . if you don't accelerate the tug quickly enough, if you begin to let that
> wire come out too quickly, its own weight starts to strip more wire off the drum and pull
> it down toward the bottom, and that's what we usually say we are dumping wire. That's
> usually a signal to kick the tug speed up so you can, you know, rectify that, get it back
> under control.[105]

Accordingly, Captain DiNapoli concluded that the KATIE G. crew dumped in excess of 1,300

feet into the water on July 13, 2010.

   While McAllister disputes the evidence suggesting that the KATIE G. crew dumped the

tow wire, Mr. Bird's testimony partially corroborates both Marcus Jerz's comment and Captain

DiNapoli's assessment of the KATIE G. crew's tow operations on the day of the incident. Mr.

Bird inconsistently testified regarding whether the tow wire was released in a controlled manner;

however, the Court finds Mr. Bird's initial testimony more credible. First, Mr. Bird testified that

the engineer, Charles Sturgis, disengaged the brake on the winch and released the tow wire in

"free wheel mode":

> [BIRD]: Charlie [Sturgis, the engineer aboard the KATIE G.] was right beneath me.
> From the aft control I could look right down and talk to Charlie. And what he's doing at
> that time is disengaging the winch, what we call putting it in the free wheel mode so it's
> not under power . . . . Once he gets the gears disengaged and it's in what we call the free
> wheel mode, he let's [sic] me know that he's ready.
>
> QUESTION: What does free wheel mode mean again?

---

[104] Trial Tr. 86:14-87:24 (discussing Jerz's deposition testimony which Captain DiNapoli relied on in formulating
his opinion).
[105] Trial Tr. 87:10-88:17.

[BIRD]: The drum on the tow winch that holds the cable can be engaged to where you can power it in. You can pull something in, or you can power it out. You can disengage the gears, which allows it to turn freely with the brake completely off. So that's what disengage means. He disengaged it, and he had it in the free wheel mode.

QUESTION: Does he indicate to you that he has disengaged and is free wheeling?

[BIRD]: Yes.[106]

Soon after this testimony indicating that Charles Sturgis turned off the brake on the winch

completely, Mr. Bird then testified that the brake on the winch actually was not completely

disengaged when Mr. Sturgis began releasing the tow wire:

> ... I slowed down the boat. And when I did that and [Charles Sturgis] was ready, he started releasing the brake. We call it releasing the brake because he is taking pressure off of it. He never actually completely releases the brake. The drum never free wheels. It's a controlled free wheel because the brake is always dragging on it. And we do that to keep a little tension on the cable and to keep the cable up off of the stern of the boat. Because if we opened it up and let it free wheel, it would just run wild, the cable would bird cage on the spool, and it would be dragging on the back of the boat going out, which would all create damage to the cable and could cause injury to anybody back there in the area.[107]

The Court finds Mr. Bird's initial testimony to be more credible and corroborated by Mr. Jerz's

use of the phrase "dumping more wire" and also Captain DiNapoli's assessment of the KATIE

G.'s tow operation on July 13, 2010.

Moreover, the evidence McAllister presented to prove the absence of "dumping" was not

credible. Mr. Donald Kinsey testified that his review of the Navy's video of the Degaussing

Range demonstrated to him that there was no dumping of the wire in an uncontrolled manner:

QUESTION: Are you familiar with the concept of dumping or paying out tow wire too quickly?

[KINSEY]: Yes .... If a brake fails, which happens at times, the drum will release the wire totally uncontrolled, no drag on the brake. The wire will come off the drum like a fishing reel if you cast a line and don't keep your thumb on it. It will backlash or birds nest. The wire will bunch up in coils. Visually you will see a lot of red rust dust in the

---

[106] Trial Tr. 382:21-383:15.
[107] Trial Tr. 384:16-385:4.

air. These wires have surface rust on them.  It will create visual indication, and there's also a lot of noise associated with it.

QUESTION:  Are you aware of any evidence showing that that happened on this day?

[KINSEY]:  No, sir.[108]

However, when the Court questioned Mr. Kinsey regarding how he formulated his opinion that

the KATIE G. crew did not dump the tow wire, Mr. Kinsey indicated that he relied on the

Navy's video of the Degaussing Range on July 13, 2010:

[KINSEY]:  I would think on the video images that they have that the Navy produced where they show the tug as it's passing, basically, over the range and to the east, if you look at that, there's no evidence on a spool of that machine that that wire is bird caged or disturbed.

THE COURT:  You were able to see the wire clear enough on the video to determine whether these indicia of dumping occurred?

[KINSEY]:  You could see the top of the spool.  If they had uncontrollably dumped 1500 feet of wire, it would be turns [sic] way up above the top of the towing machine.[109]

The Court does not credit this testimony to prove the absence of dumping, as the Court also

viewed the video Mr. Kinsey referenced and does not believe that he could ascertain the absence

of dumping from this video.  Additionally, the greater weight of the evidence – including the

testimony of two KATIE G. crewmembers and Captain DiNapoli's testimony – shows that the

crew "dumped" or quickly released too much tow wire on July 13, 2010.

Further, the Court finds that it was foreseeable that dumping 1,300 feet of tow wire as the

KATIE G. approached the Degaussing Range could result in either the tow wire itself damaging

the Range or the tow wire snagging an object on the seabed and damaging the Range

accordingly.   As previously discussed, the KATIE G. crew is well aware of the presence of the

Degaussing Range as a charted structure in its home port.  Additionally, while Captain DiNapoli

---

[108] Trial Tr. 448:11-449:2.
[109] Trial Tr. 451:6-451:18.

testified that the tug's master, Captain Hinson, would not be expected to know the exact

configuration of the Degaussing Range, Captain Hinson and his crew were on notice from the

NOAA chart warning that cable areas may include both buried and unburied cables. Moreover,

the crew is imputed with notice of the ongoing construction to the Range. Based on these facts,

it was foreseeable that dropping a tow wire to the seabed could cause damage to the Range.

Moreover, the unrebutted evidence in the record shows that a mariner, specifically a tug

master, should expect all kinds of debris to be on the riverbed. Captain DiNapoli credibly

testified regarding this issue:

> [DiNAPOLI]: You can never assume that any seabed is clear. There's all sorts of debris
> that over centuries have fallen off frigate sailing ships that used to appear back in the, you
> know, prerevolutionary war times.
>
> QUESTION: What awareness should the master of a tug have of the possibility that his
> wire could pick up an object from the bottom if it strikes the bottom?
>
> [DiNAPOLI]: That's one of the reasons we don't want our wire ever anywhere near the
> bottom. There is junk down there. I have snagged my own on a number of occasions.[110]

Captain DiNapoli further testified that the way to minimize the possibility of snagging an object

on the seabed is to "[c]ontrol your catenary,"[111] and that it did not appear that the KATIE G.

controlled its catenary well because "if the cable is permitted to fall to the seabed, it engaged

something and pulled it through that cable area causing the damage."[112] Therefore, it was

foreseeable that the KATIE G. releasing too much tow wire as it approached the Degaussing

Range would cause the damage that the array sustained. Accordingly, Court further finds that

the crew of the KATIE G. was negligent to dump out 1,300 plus feet of wire in the vicinity of the

Degaussing Range which was under construction on July 13, 2010.

---

[110] Trial Tr. 93:10-93:19.
[111] Trial Tr. 93:20-93:23.
[112] Trial Tr. 93:24-94:6.

The evidence McAllister presented to prove that the KATIE G.'s tow wire did not drag along the seabed is also unpersuasive. Specifically, the Court finds the testimony and other evidence regarding the absence of any "chroming" on the KATIE G.'s tow wire as lacking in credibility. Firstly, there is no credible evidence in the record which proves that chroming would result from a steel tow wire dragging along the bottom of the navigation channel, which is composed of silty mud.[113] To the contrary, McAllister's expert, Mr. Kinsey, testified that when a tow wire drags along a mud bottom, the wire will be caked with mud, not chromed:

> QUESTION: If a towing wire is actually touching the river bottom, what kind of signs are there for the crew that it's dragging?
>
> [KINSEY]: It will what we call twitch. The wire will wobble. It will tend to jump. The distance that the wire enters the water at the stern of the tug will change. The other indication that you have is when you haul the wire at the conclusion of your voyage, if it's touched bottom, *if it's a mud bottom, it will usually come up caked with mud and shell; if it's a sand or gravel bottom, it will come up with a real bright shine called chrome*; if it's been dragged over rocks, it will have damage. Some of the surface wires will be bent, cut, called fish hooks. So on examination after a tow, you can tell whether or not your wire has contacted anything during the tow.
>
> QUESTION: Are you aware in your investigation of any such evidence?
>
> [KINSEY]: There was evidence produced that I reviewed that said when the wire was hauled, there was no damage [sic].[114]

Mr. Kinsey's testimony contradicts Captain Hinson's testimony that any dragging along the bottom would result in chroming:

> QUESTION: Are you familiar with what happens to tow wires that drag the bottom?
>
> [HINSON]: Yes, sir. . . . It's called chroming. A cable that has been drug on the bottom as big as the one is on the KATIE for any length of time at all, just two or three minutes, it will shine it up and it gives it a chroming effect.[115]

---

[113] Trial Tr. 246:9-246:16; Trial Tr. 293:8-293:14.
[114] Trial Tr. 437:22-438:16 (emphasis added).
[115] Trial Tr. 361:22-362:2.

Captain Hinson's testimony fails to distinguish between different types of seabed, as Mr. Kinsey's testimony does, and is simply not credible to the Court.

McAllister also presented demonstrative evidence to show this chroming effect. Captain James Westall testified that he obtained tow wire similar to the KATIE G.'s and directed his staff to take the wire out and drag it along the seabed for five minutes.[116] However, McAllister did not present evidence to show that the sample wire was dragged in the navigation channel or other comparable environment, namely a silty mud bottom. The Court simply is not persuaded that chroming would result from the KATIE G.'s tow wire dragging along the seabed or snagging an object on the seabed in the navigation channel.

Moreover, even if the Court credited this testimony that chroming would result from the tow wire dragging along the seabed, there is no credible evidence that the KATIE G.'s wire did not chrome or reflect other physical evidence of being dragged along the bottom following the incident. Captain Richard Hinson testified that he saw no evidence of chroming on the tow wire. However, Captain Hinson only observed part of the wire being reeled in as the crew ended the voyage in Baltimore and the captain also was observing from the pilothouse.[117] Captain Hinson's vantage point and inability to see all or even most of the wire renders his testimony as to the lack of chroming on the tow wire unconvincing. McAllister's expert, Dr. Kinsey, also testified that he saw no chroming or other evidence that the tow wire hit anything. However, Dr. Kinsey conceded that he did not inspect the tow wire until sometime in 2011, and he was unsure whether it was the same tow wire that the KATIE G. used on July 13, 2010.[118] Captain Westall likewise testified that his port captain found no evidence on the KATIE G.'s tow wire that it had dragged the bottom or hit anything, but the Court significantly discounts this testimony. The

---

[116] Trial Tr. 396:12-397:11.
[117] Trial Tr. 366:14-370:2.
[118] Trail Tr. 450:14-450:22.

Court finds no credible evidence in the record that indicates either that chroming would result from a tow wire dragging along the navigation channel's silty mud bottom or that there was no chroming or other physical evidence of dragging present on the KATIE G.'s tow wire.

In addition to the evidence that the parties presented to prove the length of tow wire and the depth of the catenary, other circumstantial evidence in the record supports a finding of fault on the part of the KATIE G. crew. *See Bates v. Merritt Seafood, Inc.*, 663 F. Supp. 915, 927 (D. S.C. 1987) ("[P]laintiffs relied on circumstantial evidence to resolve these issues in their favor and to establish a [breach of duty] by the defendants. This court concludes that their reliance on such evidence to prove the defendants' negligence is sufficient.").

First, Mr. Bird, the mate aboard the KATIE G., testified that the crew released the wire out to the second mark because of the weather conditions and the fact that they were behind schedule:

> We were looking for the second mark [on the tow wire] because the swells in the lower end of the bay were a little rough that day, and we was in a hurry to get to Baltimore. They was a little late on labor, so we had to get out of town and try to get to Baltimore. The further back you have the cable with those weather conditions that we had that day and running a little bit late, then we are better off putting it out to the second mark.[119]

Mr. Bird's testimony that the crew was running late and in a hurry supports a finding of fault. Moreover, this testimony and Captain Hinson's testimony that the Channel traffic and swells in the Bay required the crew to release the tow wire as the KATIE G. approached the Degaussing Range do not exculpate the crew from fault for negligently executing the towing procedure. These conditions were entirely foreseeable. *See Petition of Kinsman Transit Co.,* 338 F.2d 708, 725-26 (2d Cir. 1964) ("where . . . the damage was caused by just those forces whose existence required the exercise of greater care than was taken – the current, the ice, and the physical mass of the [offending vessel], the incurring of consequences other and greater than foreseen does not

---

[119] Trial Tr. 387:20-388:2.

make the conduct less culpable or provide a reasoned basis for insulation"); *In re Signal Int'l, LLC*, 579 F.3d 478, 493 (5th Cir. 2009) ("The test of foreseeability is not measured against normal conditions, but those that were anticipated or reasonably should have been anticipated.").

Second, Captain Hinson testified that the abrupt slowdown and change in direction of both the tug and barge were routine. He explained that the slowdown was due to the tow wire taking the load of the barge and the turn was purposeful in order to get the tug to the other side of the channel and to have the barge follow the tug.[120] However, both parties' experts, Captain DiNapoli and Dr. Ryan, agree that the actual explanation for the abrupt slowdown and change in direction was that the KATIE G.'s tow wire snagged an object and dragged it through the Degaussing Range, thereby interrupting the tug's transit path.[121] The Court finds dubious the testimony of Captain Hinson, who has more than thirty years of experience in the maritime industry, that he believed that the towing operation on July 13, 2010 was routine. Kevin Bird's testimony that the towing evolution on July 13, 2010 was normal is likewise discounted. *See, e.g., CSX Transp., Inc.*, 1991 WL 173045, at *2 ("[A]ny evidence of actual negligence, or the lack of it, is likely to be known only to the persons on board, who are in the best position to either keep damaging evidence hidden, or bring favorable evidence forward.") (citations omitted).

Therefore, the Court finds that Captain Hinson and his crew failed to exercise reasonable care when traversing a known cable area that was under construction. In fact, the credible evidence in the record indicates that the KATIE G. did not respond to the calls from the Navy's Degaussing Range or the USNS ARTIC when the Navy was attempting to ascertain the identity of the tug in the vicinity of the Degaussing Range shortly after the Range's sensors stop

---

[120] Trial Tr. 373:9-374:10.
[121] Trial Tr. 108:19-108:24.

functioning.   Both Timothy Murphy, an operator of the Degaussing Range, and even Donald George, a deck hand aboard the KATIE G., testified that they did not hear the KATIE G. respond to the Navy's calls over the VHF radio.   Captain Hinson's testimony that he, in fact, did respond lacks credibility.[122]   These facts illustrate that Captain Hinson's actions were not reasonable under the circumstances since it is not reasonable for a vessel to fail to answer such calls.

In addition to the Court's finding that the preponderance of the evidence shows that the crew aboard the KATIE G. was negligent, the doctrine of *res ipsa loquitur* also supports the Court's finding of McAllister's liability.  *Res ipsa loquitur* creates a rebuttable presumption of negligence in certain cases where: "(1) the event is of a type which ordinarily does not happen in the absence of someone's negligence; (2) the instrumentality causing the injury was, at the time of the accident, within the exclusive control of the defendant; (3) the accident was not due to any voluntary action or contribution on the part of the plaintiff."  *Estate of Larkins by Larkins v. Farrell Lines, Inc.*, 806 F.2d 510, 513 (4th Cir. 1986).

Norfolk Harbor is a busy navigation channel with heavy commercial traffic.   Every vessel inbound to the port of Norfolk must cross the Degaussing Range.   The KATIE G. itself has traversed the Degaussing Range hundreds of times and has lengthened its tow wire in the same location as it did on July 13, 2010 occasionally.[123]   Since the Degaussing Range has been in its current location since 1990, it has suffered just four incidents of objects being dragged through the array.   The KATIE G. in particular never struck the Degaussing Range prior to July 13, 2010.   Further, the record shows that it is not a common occurrence for a tow wire to hit the bottom of the seafloor; it is more likely to happen in shallow water, e.g., 20 feet deep,[124] which was not the case here.   Accordingly, the Court finds that the damage to the Degaussing Range normally does

---

[122] *See* Hinson Dep. at 47:3-50:24.
[123] Trial Tr. 436:17-437:2.
[124] Hinson Dep. 51:9-52:8.

not occur in the absence of negligence.  Additionally, the KATIE G. was under the exclusive

control of the KATIE G. crew at the time of the allision.  Moreover, and as discussed herein, the

United States Navy was without fault for the damage to the Degaussing Range.  Accordingly, the

Court finds that the doctrine of *res ipsa* bolsters the Court's conclusion that the KATIE G. crew

was negligent on July 13, 2010.

## B. McAllister's Claim for Limitation of Liability

Since the Court has found the KATIE G. crew negligently released the tug's tow wire,

McAllister is not entitled to exoneration from liability.  However, having found the KATIE G.

crew negligent, the issue now is whether McAllister had privity or knowledge of this negligence

which prevents a limitation of its liability.

Under the Limitation Act, an owner of a vessel that was involved in an accident may

bring an action in federal court to determine whether the vessel is liable for the loss and whether

the vessel owner's liability should be limited.  46 U.S.C. §§ 30501-35012 (2006).  "[T]he

determination whether a shipowner may limit liability involves a two-step analysis:  1) a

determination of what acts of negligence or unseaworthiness caused the casualty; and 2) whether

the shipowner had knowledge or privity of these acts." *In re American Milling Co.*, 270 F. Supp.

2d at 1087 (citing *In re Cleveland Tankers*, 67 F.3d 1200, 1203 (6th Cir. 1995)).  A vessel owner

may limit liability to the value of his interest in the vessel plus pending freight upon a showing

that the cause of the accident was not within his privity or knowledge.  46 U.S.C. §§ 3505(a) &

(b).  A vessel owner seeking to limit his liability bears the burden of proving that he did not have

privity or knowledge of the condition or negligence that caused the accident.  *Hellenic Lines,*

*Ltd. v. Prudential Lines, Inc.*, 813 F.2d 634, 638 (4th Cir. 1987); *In Matter of Complaint of*

*Vulcan Materials Co.*, 674 F. Supp. 2d 756 (E.D. Va. 2009).  Privity and knowledge, as used in

the statute, mean that a vessel owner knew or should have known that a certain condition existed.

*Hellenic Lines, Ltd.*, 813 F.2d at 638. More specifically:

> It has been said that 'privity' means some fault or neglect in which the owner personally participates, and 'knowledge' means personal cognizance or means of knowledge, of which the owner is bound to avail himself, of a contemplated loss or condition likely to cause or contribute to loss, unless proper means are adopted to prevent it.

*Illinois Constructors Corp. v. Logan Transp.*, 715 F. Supp. 872, 880 (N.D. Ill. 1989) (internal

citations and alterations omitted). In the case of a corporation, the privity or knowledge

requirement applies to "an executive officer, manager, or superintendent, whose scope of

authority includes supervision over the phase of the business out of which the injury occurred."

*Empresas Lineas Maritimas Argentinas S.A. v. United States*, 730 F.2d 153, 155 (4th Cir. 1983).

However, "the limited liability doctrine is also sensitive to the scope of an owner's

control over his agents." *Complaint of Hellenic, Inc.*, 252 F.3d 391, 396 (5th Cir. 2001).

Therefore, in ordinary circumstances,

> where the owner is so far removed from the vessel that he cannot reasonably exert control over the captain or pilot's conduct, the captain/pilot's navigational errors at sea are generally not within the "privity or knowledge" of the owner.

*Complaint of Hellenic, Inc.*, 252 F.3d at 396; *Matter of Mac Towing, Inc.*, 670 F.2d 543, 548 (5th

Cir. 1982). On the other hand,

> [i]f . . . navigational error, [sic] can be attributed to incompetence on the part of the crew, and such incompetence was within the shipowner's reasonable providence to discover, then limitation should be denied. Key factors which may contribute to a crew's incompetence, and be within the privity and knowledge of the shipowner and supervisory personnel, is the failure to implement proper procedures in hiring crews, the absence of any meaningful training, or the absence of the implementation of proper procedures for the safe navigation of the vessel.

*In re American Milling Co.*, 270 F. Supp. 2d 1068, 1111 (E.D. Mo. 2003) (citing *Complaint of*

*Hercules Carriers*, 768 F.2d 1558, 1573-77 (11th Cir. 1985)); *see also In re Bowfin M/V*, 339

F.3d 1137 (9th Cir. 2003) (holding that shipowner was entitled to limitation where sole and

proximate cause of collision was spontaneous negligent navigation errors of master of tug, not

master's fatigue); *In re Mo Barge Lines*, 360 F.3d 885 (8th Cir. 2004) (upholding shipowner's

limitation of liability where it had hired "licensed, competent operator" who had been accident-

free for seven year before committing one-time, pilot error).

The United States contends that McAllister should not be able to limit its liability because

McAllister provides no written guidance to its captains or crew members regarding the proper

procedures for lengthening tow wire.  The United States also argues that McAllister must be held

to a heightened standard of care within its home port.  Therefore, according to the United States,

McAllister's failure to regulate the procedures its vessels employ when lengthening tow wire in

its home port imputes it with the requisite knowledge of the KATIE G.'s negligent towing

procedures.  McAllister counters that if it is found liable for the damage to the Degaussing

Range, its liability should be limited to the value of the KATIE G. because McAllister had no

knowledge of the negligence that caused the incident.  McAllister asserts that Captain Richard

Hinson and his crew were very experienced and had navigated from Norfolk, Virginia to

Baltimore, Maryland over a hundred times without incident prior to July 13, 2010.  Thus,

McAllister argues it was not on notice of any negligence on the part of Captain Hinson and his

crew, even if senior management has observed the crew's towing procedures in the past.

McAllister further contends that written guidance on streaming tow wire is impossible because

of the variables that affect when and where a captain should lengthen the tow wire, including

weather and traffic conditions.

The Court finds that the preponderance of evidence at trial shows that Captain Hinson

and his crew were clearly competent to man the KATIE G. and to navigate her through the

Norfolk Harbor Reach Channel on July 13, 2010.  The United States also makes no argument to

the contrary. Additionally, McAllister's manuals demonstrate that the company has limited control over the master of the tug, who is in sole command of the vessel. Further, the credible evidence indicates that McAllister's failure to provide written instructions on the proper procedures for lengthening tow wire does not amount to negligence on the part of the ship owner to warrant a denial of limitation of liability under the Limitation Act. There is no credible evidence that these written procedures are a common practice in the industry. There also is no evidence that, prior to July 13, 2010, the KATIE G. had any incidents related to lengthening an excess amount of tow wire. Therefore, the Court finds that this one-time error on the part of Captain Hinson and his crew does not warrant a denial of limitation of liability for McAllister.

Accordingly, the United States' claim for damages is limited to the fair market value of the KATIE G. MCALLISTER on July 13, 2010 – $2,520,000.00.

## C. Comparative Fault of United States Navy

In addition to denying negligence on the part of the McAllister crew aboard the KATIE G., McAllister has argued that it should not be held liable for the damage to the Degaussing Range because the United States violated the terms of its ACOE and VMRC permits, or alternatively, because the United States negligently designed the Degaussing Range and is partially or wholly at fault for the damage as a result. Accordingly, McAllister relies in part on the *Pennsylvania* Rule, which holds that if a vessel or structure involved in a collision or allision was in actual violation of a statutory or regulatory rule that is intended to prevent such incidents, the burden shifts to the non-compliant vessel or structure to show that its violation was not a cause of the incident. *See The Pennsylvania*, 86 U.S. 125, 136 (1873); *Evergreen Int'l, S.A. v. Norfolk Dredging Co.*, 531 F.2d 302, 310 (4th Cir. 2008). For the rule to apply, three factors must exist: "(1) proof by a preponderance of the evidence of violation of a statute or regulation

that imposes a mandatory duty; (2) the statute or regulation must involve marine safety or navigation; and (3) the injury suffered must be of a nature that the statute or regulation was intended to prevent." *Union Pacific R. Co. v. Kirby Inland Marine, Inc. of Miss.*, 296 F.3d 671, 674 (8th Cir. 2002) (citing *Folkstone Mar. Ltd. v. CSX Corp.*, 64 F.3d 1037, 1047 (7th Cir. 1995)).

Specifically, McAllister argues that because the cables were not at or below -57 Mean Low Water, the structure was in violation of its permits and thus, an obstruction to navigation. McAllister also alleges that the United States' failure to cover the Range's cables with protective gravel by July 13, 2010 amounts to a violation of the United States' permits. Additionally, McAllister argues that because the original design of the Degaussing Range required the cables to buried to at least -57 MLW, the Navy's failure to retain this more protective design over time indicates that the United States was negligent. The United States denies McAllister's allegations.

The Court finds that McAllister has not proved by a preponderance of the evidence that the United States was in violation of its ACOE or VMRC permits. Accordingly, McAllister has failed to satisfy the first of three requirements to apply the *Pennsylvania* Rule, that there exists "proof by a preponderance of the evidence of violation of a statute or regulation that imposes a mandatory duty." *Union Pacific R. Co. v. Kirby Inland Marine, Inc. of Miss.*, 296 F.3d 671, 674 (8th Cir. 2002). McAllister introduced evidence into the record regarding historical permits related to the Degaussing Range. However, the credible evidence indicates that the ACOE permit in force at the time of the July 13, 2010 incident only required that the cables located at the point of contact with the drag mark be covered with protective gravel, not that they be

44

buried.[125]  Evidence that the cables were not buried or not at or below -57 Mean Low Water is not relevant to the damage at the point of contact between the cables and the unknown object that the KATIE G. dragged through the Range.  Further, the permit for construction work ongoing at the time of the incident was set to expire on September 9, 2011 at the earliest.[126]  The Court declines to find the Navy in violation of a work permit on July 13, 2010, where the permit did not expire for more than another year.  Additionally, the United States' latest VMRC permit in the record was issued February 28, 2006 and expired on February 28, 2009.[127]  Therefore, the Court is unable to determine whether the Degaussing Range was in violation of its VMRC permit on the record before it.

Notwithstanding the fact that the ACOE permit had not expired on July 13, 2010, McAllister points to the fact that the cables were installed and operational and yet uncovered with gravel on July 13, 2010 as evidence of the Navy's failure to comply with its ACOE permit.  However, the Court finds no evidence of any legal requirement that the United States must have covered the cables with gravel on July 13, 2010 to trigger the *Pennsylvania* Rule.  The *Pennsylvania* Rule requires proof of a violation of a statute or regulation that imposes a *mandatory duty*, and McAllister simply has failed to prove by a preponderance of the evidence that covering the cables with gravel on July 13, 2010 was mandatory.  Moreover, McAllister is well aware of the location of the Degaussing Range, as a structure located within its home port.  As noted earlier, the NOAA charts clearly show the Range's location and provide the following warning:

---

[125] McAllister Ex. 25; U.S. Ex. 26; Trial Tr. 149:1-152:18.
[126] McAllister Ex. 84:  "The NWP-3 verification is valid for two years from the date of this letter [September 9, 2009].  If this verification letter expires before the NWP itself expires, the activity continues to be authorized until the expiration date of the NWP . . . ."
[127] McAllister Ex. 340-1 at US000120; McAllister Ex. 83.

> *Not all submarine pipelines and submarine cables are required to be buried, and those that were originally buried may have become exposed.* Mariners should use extreme caution when operating vessels in depths of water comparable to their draft in areas where pipelines and cables may exist, *and when anchoring, dragging, or trawling.*[128]

*See Delta Transload, Inc. v. M/V NAVIOS COMMANDER,* 818 F.2d 445, 449 (5th Cir. 1987) ("knowledge of an otherwise nonvisible object warrants imposition of presumed negligence against those operating the vessel who possessed this knowledge"). Further, the LNM disseminated on July 6, 2010 indicated that there was still ongoing construction to the Degaussing Range.[129] Thus, not only has McAllister not proven that the United States was in violation of its ACOE or VMRC permits, but also McAllister specifically was on notice from the NOAA of the potential that cables may have become unburied and that the Range was under construction on July 13, 2010.

McAllister argues that the absence of construction vessels or other signs of ongoing construction on July 13, 2010 gave the KATIE G. cause to believe that the construction referenced in the LNMs was complete; however, this argument is unavailing. On July 6, 2010 – just one week before the KATIE G. incident – the Coast Guard issued an updated warning about the ongoing construction in the cable area. Additionally, McAllister's Vice-President and General Manager, Captain Westall, testified that McAllister emails the LNMs to its captains; thus, Captain Hinson is imputed with knowledge of this ongoing construction as of July 6, 2010.

McAllister also contends that the United States was negligent in its maintenance of the Degaussing Range, both on the day of the incident and in general. McAllister asserts that the United States was negligent not to cover the cables with protective gravel once the cables and electronics were operational, approximately two months before the McAllister incident.

---

[128] U.S. Ex. 7; Trial Tr. 72:4-72:19 (emphasis added).
[129] U.S. Exs. 9, 10; Trial Tr. 96:3-97:23; Steeves June Dep. 143:23-144:8.

McAllister also argues that the United States negligently designed the Degaussing Range by opting to provide less, rather than more, protection to the Range over time.  In these ways, even if the United States was not in actual violation of its permit, it still was negligent in designing the Degaussing Range, according to McAllister.  *See Folkstone Maritime, Ltd. v. CSX Corp.*, 64 F.3d 1037 (7th Cir. 1995) ("Liability for allisions may be imposed even in the absence of a statutory violation, if negligence was involved.").

In support of McAllister's contention that the United States was negligent not to cover the cables with protective gravel before the July 13, 2010 incident, McAllister offers the statements of Travis Steeves, General Engineer and Project Manager of Naval Facilities Engineering Command, and Lonnie Winkleman, Product Line Manager of Magnetic Licensing Facilities at Naval Facilities Engineering Services Center.  Mr. Steeves described the Navy's decision not to protect the cable path with gravel during the two months it was exposed prior to July 13, 2010 as "a calculated risk, much like open-heart surgery.  There's a period where you have to be careful and just hope for the best."[130]  Further, Mr. Steeves believed that the protective gravel was not going to make much of a difference, e.g., if an anchor went through the range similar to the 2007 anchor drag incident.[131]  Similarly, Mr. Winkleman acknowledged that objects get dragged across the bottom of the riverbed "occasionally" and gravel would provide added protection.[132]  However, the Court finds that the United States is not bound by these statements or, alternatively, that they do not rise to the level of negligence.  Leaving the cables unprotected for almost two months was not unreasonable in light of the NOAA warnings that the cable areas may be exposed and the LNMs' warning of the ongoing construction.

---

[130] Steeves Sept. Dep. 219:18-219:20.
[131] Steeves Sept. Dep. 219:15-220:12.
[132] Lonnie Winkleman Deposition at 52:8-22 (October 12, 2011) ("Winkleman Oct. Dep.").

The Court further finds that McAllister has offered mostly speculative and unreliable

opinion evidence in support of its argument that the United States negligently designed the

Range. The Court does not rely on the opinions and recommendations of Ronald Glosemeyer,[133]

Gregory Sears,[134] Lonnie Winkleman,[135] and the Seward Marine Corporation,[136] none of whom

are qualified as experts to provide their opinions regarding the soundness of the Degaussing

Range's design. The remaining evidence relating to the lack of any accidents between 1990 and

2006[137] and the fact that the five buried cables were not damaged[138] are insufficient to establish

the United States' comparative negligence. McAllister simply cannot escape "the universally

accepted rule that the defendant takes the plaintiff as he finds him and will be responsible for the

full extent of the injury even though a latent susceptibility of the plaintiff renders this [injury] far

more serious than could reasonably have been anticipated." *Petition of Kinsman Transit Co.*,

338 F.2d 708, 724 (2d Cir. 1964); *Nat'l Shipping Co. of Saudia Arabia v. United States*, 95 F.

Supp. 2d 482, 495-96 (E.D. Va. 2000) ("The notion that one takes your victim as you find him,

remains an accepted part of the legal lexicon" regarding damage to a fragile United States Navy

submarine). Rather, the evidence clearly shows that mariners are well-aware of the location of

the Degaussing Range on the NOAA charts. Additionally, as a passive structure on the seabed,

the Degaussing Range provides ample space for vessels to pass over it without hitting the

structure; thus, it is not an obstruction to navigation. *See, e.g., The Elise, 288 F. 575* (N.D. Cal.

1923) (stating stationary structure's "cable was not an obstruction to navigation. It was laid at

the bottom of the river, and there was ample water above for vessels navigating the stream in the

---

[133] Ronald Glosemeyer Deposition, Ex. 2 (October 6, 2011) ("Glosemeyer Dep."); Glosemeyer Dep. 21:11-23:7.
[134] Gregory Sears Deposition at 16:22-17:16 (September 23, 2011) (Sears Dep."); Sears, Ex. 1 at 1.
[135] Lonnie Winkleman Deposition at 56:16-60:9 (June 15, 2011) ("Winkleman June Dep.").
[136] McAllister Ex. 329-10 at US000475.
[137] Trial Tr. 279:1-279:4; Winkleman June Dep. at 56:13-56:15.
[138] Trial Tr. 532:7-532:20.

ordinary way."); *Petition of Potomac Sand & Gravel Co.*, 253 F. Supp. 268, 275 (D. Md. 1966) (same).

In *Petition of Potomac Sand & Gravel Company*, the district court provided an apt analysis of the issue of comparative fault in an allision case involving damage to a submerged cable:

> The preponderance of the evidence showed that Potomac knew where the cable crossing signs were located, what was the cable-crossing area, and that the cable was not entrenched.   The preponderance of the evidence also showed that the cable generally was between the cable crossing signs and, hence, within the cable-crossing area. The law does not require the presence of a submarine cable to be marked with blueprint precision; it is enough that cable crossing signs warn of the approximate location of the cable. When so marked, a submarine cable, constructed pursuant to a permit issued by the Corps of Engineers, is not *per se* an obstruction to navigation . . . nor is a cable laid on a river bottom with ample water above for vessels to pass over it in the ordinary way, an obstruction to navigation.  In the instant case, the cable was sufficiently marked and the damage did not result from navigation in the ordinary way.

*Petition of Potomac Sand & Gravel Co.*, 253 F. Supp. at 275 (internal citations omitted). Similarly, the Court finds that the damage to the Degaussing Range – a well-known, submerged structure – did not result from "navigation in the ordinary way," *id.* at 275, and that the United States was not partially at fault for this damage.  *See id.* (internal citations omitted) ("notwithstanding [limitation plaintiff's] claim that negligence in the installation and maintenance of the cable was the sole cause of damage to it, [limitation plaintiff's] floating equipment, including the [offending vessel], passed over the cable fifty-six times prior to February 8, 1964 without damage either to the electric power cable or any other preexisting cables.").

Most importantly, the ACOE approved the permit and technical drawings accompanying the permit application that were in force on July 13, 2010.  Therefore, the Court declines to supplant its judgment for that of governmental agencies with greater expertise in this area in

order to conclude that the Degaussing Range was poorly designed. *See, e.g., Am. Telephone & Telegraph Co. v. Steuart Transp. Co.*, 1978 A.M.C. 1680 (D. Md. 1977) ("[The] permit contained no requirement that the cables be entrenched in the river bottom. The issuance of the permit was a determination that the installation of the cables with no special conditions attached was a reasonable obstruction to the navigable waters; [sic] a determination that should not be overturned by this court."). The Court concludes that the United States was not comparatively negligent for the damage to the Range.

## D. Damages

The United States has submitted a claim for damages in the amount of $3,506,506.80 stemming from its costs to repair the Degaussing Range to its pre-casualty state. *Hewlett v. Barge Bertie*, 418 F.2d 654 (4th Cir. 1969) (a vessel owner is entitled to an award for damages that restores the injured vessel to its pre-casualty condition); Schoenbaum, Admiralty & Maritime Law § 14-6, at 143-45 (applying the damages principle of pre-casualty repair to shore structures and fixed objects). However, the Court has found that McAllister was entitled to a limitation of liability under the Limitation Act. Therefore, the maximum amount that the United States may recover in this action is $2,520,000.00, which was the fair market value of the KATIE G. on July 13, 2010.

The Court finds that the United States has proven its damages in the amount of $3,199,938,[139] which is the amount to assess and remove the damage from the July 13, 2010 incident plus the cost to repair it to its pre-casualty condition. This figure includes: 1) $495,419 for contractor services to assess and remove the damage; 2) $140,002 for support services from the Naval Facilities Engineering Service Center (NFESC) to assist with the assessment and removal of the damage; 3) $2,172,684 for contractor services to repair the Degaussing Range to

---

[139] U.S. Ex. 24; *see* Trial Tr. 198:16-220:9.

its pre-casualty condition; and 4) $391,834 for NFESC's support services to assist with the repairs. The Court finds that the United States has not proven the additional $306,568.80 in its claim for damages. As the United States has proven damages in excess of the fair market value of the KATIE G. on July 13, 2010, Court finds that the United States is entitled to damages equal to the KATIE G.'s fair market value on July 13, 2010, or $2,520,000.00.

## E. Prejudgment Interest

The Court must determine whether to grant prejudgment interest on the damages. In *City of Milwaukee v. Cement Division, National Gypsum Company*, the Supreme Court held that prejudgment interest is to be awarded routinely in admiralty cases. 515 U.S. 189, 195 (1995). The Supreme Court stated: "[A]s a general rule . . . prejudgment interest should be awarded in maritime collision cases, subject to a limited exception for 'peculiar' or 'exceptional' circumstances." *Id.* at 195. In admiralty cases, prejudgment interest is an element of damages, "part of full and fair compensation to the injured party." *Ameejee Valleejee & Sons v. M/V Victoria U.*, 661 F.2d 310, 313 (4th Cir. 1981). The Court notes that "pre-judgment interest is not automatically conferred and may be barred under certain circumstances, such as undue delay by the prevailing party in bringing suit." *Id.* at 495. "When awarding prejudgment interest, the Court has discretion with regard to the interest rate and the date when interest begins to accrue." *Norfolk S. Ry. Co. v. Moran Towing Corp.*, 718 F. Supp. 2d 658, 663 (E.D. Va. 2010); *see also Ameejee Valleejee & Sons*, 661 F.2d at 313 (noting that district courts "have been urged to follow the interest rate prevailing commercially"); *Indep. Bulk Transp., Inc. v. Vessel Morania Abaco*, 676 F.2d 23, 25 (2d Cir. 1982) ("Prejudgment interest has often been awarded from the time of injury.").

The Court finds that prejudgment interest is appropriate in this case, as there are no exceptional circumstances that would suggest otherwise.  Accordingly, the Court **GRANTS** the United States prejudgment interest from the date of the allision to the date of this judgment at the average prime interest rate, to be compounded annually.  *See Norfolk & Portsmouth Belt Line R.R. Co. v. M/V MARLIN*, 2:08cv134, 2009 WL 3363983, at *14-*15 (E.D. Va. Oct. 9, 2009) (granting prejudgment interest from the date of an allision and at the average prime rate, compounded annually); *Norfolk S. Ry. Co.*, 718 F. Supp. 2d at 663, 663 (E.D. Va. 2010) (granting plaintiff prejudgment interest at "the average prime interest rate and from the date of the allision to the date of this judgment").

## IV. CONCLUSION

For the foregoing reasons, McAllister's claim for exoneration from liability is **DENIED** and McAllister's claim for limitation of liability is **GRANTED**.  The Court **GRANTS** the United States damages in the amount of $2,520,000.00.

The Court further **GRANTS** the United States prejudgment interest on this damages award, at the average prime interest rate and from the date of the allision through the date of entry of judgment, compounded annually.

The Clerk is **DIRECTED** to send a copy of this Order to the parties and counsel of record.

**IT IS SO ORDERED**.

Raymond A. Jackson
**United States District Judge**

Norfolk, Virginia
April _3_ , 2012